IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) Civil No. 20-282 |
| | ) |
| JAVON POPE | ) |

**Opinion and Order**

Defendant Javon Pope was initially, in a two-count Indictment, charged with Attempting to Remove Property and Take Other Action to Prevent Seizure related to a Hermann Weihrauch revolver, in violation of 18 U.S.C. § 2232(a); and Possession of a Firearm by a Convicted Felon, namely a Hermann Weihrauch revolver, in violation of 18 U.S.C. § 922(g)(1). ECF No. 1. On September 9, 2024, the Court issued an Opinion and Order, denying Mr. Pope's Motion to Suppress Physical Evidence and Statements (ECF No. 56) and his Motion to Suppress Phone Seizure and Search (ECF No. 61). Op. and Order, Sept. 9, 2024, ECF No. 66. The Opinion and Order was issued without a hearing, as, at that time, the parties agreed that a hearing was not necessary.

On October 8, 2024, the government filed a Motion, requesting that the Court schedule a suppression hearing on the Motions, citing a concern that a sufficient record has not been created. ECF No. 78. After consultation with both parties, the Court set a hearing for November 12, 2024. ECF No. 82, The parties filed a Status Report on October 22, 2024, memorializing the factual disputes to be heard at the hearing. ECF No. 83. Thereafter, on October 22, 2024, the government filed a two-count Superseding Indictment, charging Mr. Pope with the same charges as originally filed; but, in addition to the Hermann Weihrauch .357 revolver identified in the Indictment, the Superseding Indictment states that each count also relates to three additional

firearms: a Cobray .45 handgun, a Sig Sauer .223 rifle, and a Marlins Firearms .22 rifle. ECF No. 83. At the November 12, 2024 hearing, the government presented the testimony of Sergeant John Brennan of the Allegheny County Police. Following reconsideration of the issues presented in the Motions to Suppress Evidence, and having considered said Motions, plus the evidence and argument presented at the November 12, 2024 hearing, the Court will vacate its September 9, 2024 Opinion and Order, and for the reasons that follow, Mr. Pope's Motions will be denied.

    I.    **Background**

Mr. Pope's initial detention occurred during the execution of a federal arrest warrant for a third-party, Maurice Miller, on November 19, 2019. On November 13, 2019, a federal grand Jury returned an Indictment, charging Mr. Miller with conspiracy to unlawfully distribute one kilogram or more of heroin, 280 grams or more of crack cocaine, 100 grams or more of acetyl fentanyl and valeyrl fentanyl, and 400 grams or more of fentanyl. *United States v. Miller*, Criminal No. 19-190-10, W.D. Pa. (2019). Mr. Miller was one of thirteen individuals charged in the same Indictment. The Indictment arose out of law enforcement's Title III criminal investigation into a large-scale organized drug conspiracy going by the name, "Hustlas Don't Sleep" (HDS). While there were thirteen members of the conspiracy, identified in the Indictment filed at Criminal No. 19-190, other members of the organization were charged by separate indictments.

The Federal Bureau of Investigation intended to arrest Mr. Miller at his residence in McKeesport in the early morning of November 19, 2019; however, on the morning of the operation, they learned that Mr. Miller was not there. Having already monitored Mr. Miller's cell phone by Title III authorization, law enforcement used data location software to discover that Mr. Miller's cell phone was located at 1727 Wesley Street, Pittsburgh, Pennsylvania. This

location was known to the investigators, through Title III monitoring activities, as a location that Mr. Miller frequented. In addition, as detailed below, monitored communications among HDS members revealed that Mr. Miller had recently been given a handgun in support of distributing drugs, and that he was likely distributing drugs out of the 1727 Wesley Street location.

The FBI agents, on location in McKeesport, contacted the Pittsburgh Bureau of Police (PBP) for assistance in apprehending Mr. Miller at 1727 Wesley Street. PBP SWAT Operators arrived at 1727 Wesley Street, announced their presence, and ordered the occupants of the residence to come outside. In response, two occupants exited the residence: Maurice Miller and Angel Smith. Based upon the outstanding federal arrest warrant for Mr. Miller, he was taken into custody. The decision was made to apply for a search warrant for 1727 Wesley Street and for a Blue Honda parked at the residence. Wesley Street Aff., Gov Ex. 2, Nov. 19, 2019. While waiting for the search warrant authorization, the Pittsburgh Bureau of Police SWAT Operators conducted a protective sweep of the residence. FBI 302, at 1, Nov. 25, 2019, Gov. Ex. 16. During the protective sweep, the SWAT Operators reported that they observed, in plain view, a rifle on the first floor, a rifle in a second-floor closet, a small firearm on a nightstand in a second-floor bedroom, and a revolver under a bed. *Id.*

FBI Special Agent Eric Goucher, the author of the Wesley Street Affidavit, set forth information that he believed established probable cause to justify a search of the residence. The Wesley Street Affidavit also incorporated by reference Special Agent Gaucher's November 18, 2019 HDS Affidavit, that sought and obtained search warrants for ten residences associated with the HDS drug trafficking organization. Wesley Street Aff. ¶ 4 (incorporating the HDS Aff. Gov Ex. 1, Nov. 18, 2019). The HDS Affidavit identified Mr. Miller's McKeesport residence as one of the target locations. HDS Aff. ¶ 8.f.

In his HDS Affidavit, Special Agent Gaucher described law enforcement's significant investigation into HDS members' distribution of illegal controlled substances and engagement in other related offenses. *Id.* at ¶¶ 27-104. Mr. Miller was identified as one of the HDS members, who was a member periodically assigned to be "on rotation" to distribute controlled substances to HDS customers. *Id.* at ¶¶ 35, 59. The suspected leader of HDS, Robert Howell, would send a daily text to customers, telling them the phone number to call for product. Special Agent Gaucher cited an example of a text Howell sent to his customers, telling them that they should call "fredo" at a specific phone number at a time when Mr. Miller, aka "fredo," was on rotation. *Id.* at ¶¶ 59-60. The HDS Affidavit also describes intercepted communications between Mr. Miller and Mr. Howell. On July 27, 2019, Mr. Howell directed Mr. Miller to put the cash proceeds from that day's drug sales "in the bench." *Id.* at ¶¶61-62. Mr. Howell also told Mr. Miller to bring the proceeds from the sale of crack (referred to as "crunch") back to Mr. Howell. Id. Mr. Howell remarked that the customers must be loving "them Drive Thrus" (fentanyl stamp bags), and Mr. Miller agreed and said, "especially the all white ones." Id. On July 29, 2019, Mr. Miller told Mr. Howell that he needed more of the "drive thru" stamp bags, as he was selling the last of his supply. *Id.* at ¶¶63-64. The HDS Affidavit also placed Mr. Miller, Mr. Howell, and a third HDS member, as residents of the McKeesport residence. *Id.* at ¶¶ 78-80.

In the Wesley Street Affidavit, Special Agent Gaucher included the texts from intercepted communications that were captured during the HDS investigation, in order to demonstrate a connection between Mr. Miller and the 1727 Wesley Street residence. Wesley Street Aff. ¶ 11. Law enforcement intercepted a September 16, 2019 conversation between Mr. Howell and Mr. Miller, wherein Mr. Howell talked about directing an Uber or Lyft to go to 1727 Wesley Street to pick up Mr. Miller. *Id.* In an October 7, 2019 communication, Mr. Miller told

4

Mr. Howell that he was at 1727 Wesley Street. *Id.* After he was arrested, Mr. Miller also told law enforcement that there was a firearm in the house. *Id.* at ¶ 13. At the November 12, 2024 hearing, counsel agreed that there was no evidence to establish any precise timing for when Mr. Miller had made this statement. Specifically, counsel agreed that the government's evidence would not confirm whether Mr. Miller made this statement before or after the protective sweep. Agent Gaucher's Wesley Street Affidavit also reported that a protective sweep of the residence had been performed, and that officers had viewed firearms in plain view. *Id.* Next, the Affidavit averred that Mr. Miller was a convicted felon, and was thus not lawfully permitted to possess firearms. *Id.* at ¶ 14. Finally, a canine officer's certified canine alerted to the passenger side of a vehicle, parked in the driveway of 1727 Wesley Street, which indicated the possible presence of illegal controlled substances. *Id.* at ¶ 17.

After the protective sweep, and while waiting for approval of the search warrant, law enforcement secured the residence. During the waiting period, three officers escorted resident Angel Smith, at her request, to a bedroom in the house so that she could obtain her work clothes. *Id.* While in the bedroom, officers observed the firearm on the nightstand. *Id.* In securing the residence, the officers locked all the entry doors.

FBI agents, wearing clearly marked "FBI" clothing, were included among the various law enforcement entities, who were present at the residence. Mr. Pope and other individuals were outside the residence. The officers' actions to secure the residence included periodically walking around the side of the house. On one such occasion, Special Agent Daniel Gramc heard the operation of a side door lock, which prompted the agents to reenter the home, whereupon they found Mr. Pope on the second floor. *Id.* at 2. The agents also discovered that the firearm, that had previously been observed on the bedroom nightstand, was no longer there. *Id.* Mr. Pope

was detained, and his cell phone, that was found on his person, was seized. Mr. Pope was read his *Miranda* rights, he signed a waiver of these rights, and he agreed to talk to law enforcement. *Id.* at 3-4. He told the agents that he lived at 1727 Wesley Street with his girlfriend, Angel Smith. *Id.* He said that he had a key to the residence, which he showed to the agents. *Id.* He further stated that Ms. Smith had called him that morning to tell him to come and retrieve his belongings, which is why he entered the house. *Id.* He denied moving any firearms within the residence. *Id.*

When Angel Smith was interviewed by law enforcement, she said that she had told Mr. Pope that law enforcement was at the house waiting for a search warrant. *Id.* at 4. She further told him to get his belongings, because she was kicking him out, but she did not tell him to enter the house while law enforcement was present and waiting for the search warrant to be approved. *Id.*

Later in the day, when the agents executed the approved search warrant, they discovered that the firearm, which had been earlier observed on top of the bedroom nightstand, had been relocated to inside the drawer of that nightstand. *Id.* at 3. A firearm, previously observed during the protective sweep and located under a mattress in the same bedroom, had been moved and was found in a clothes hamper. *Id.* In addition, an AR-15 rifle, previously observed in a closet, had been disassembled into two pieces. *Id.* In addition to these three firearms, officers also recovered 3 to 4 additional firearms, plus ammunition of varying calibers. *Id.*

Special Agent Gaucher also authored an Affidavit in support of a search warrant for Mr. Pope's cell phone. Cell Phone Aff. Jan. 28, 2020, Gov Ex. 3. In Paragraph 6 of the Affidavit, Special Agent Gaucher stated that the cell phone was associated with Pope, "who, as explained below, is a close associate of a target subject [Mr. Miller] in a federal drug trafficking Title III

investigation." Cell Phone Aff. ¶ 6.  In support of probable cause to search that cell phone, Special Agent Goucher explained that an arrest warrant for Mr. Miller was executed on November 19, 2019, at the Wesley Street residence where Mr. Miller had been located through the use of cell phone location data.  *Id.* at ¶ 12.  The Affidavit further stated that HDS Title III intercepts confirmed that the residence, 1727 Wesley Street, had been a narcotics distribution location for Mr. Miller during the past several weeks.  *Id.*  The Affidavit also explained that Mr. Miller had reported that there was a firearm in the residence, and that, during the protective sweep of that residence, firearms were observed in plain view inside the residence.  *Id.* at ¶¶ 12-13.  Special Agent Goucher also explained that, after the residence was secured, Mr. Pope was found inside the home and that several firearms, previously observed by officers, had been moved.  *Id.* at ¶ 13.  Mr. Pope told officers he lived in the residence on and off and that he had a key.  *Id.*  He said he was inside the residence to get his possessions.  *Id.*

A search warrant was approved, and Mr. Pope's cell phone was searched.  Law enforcement found that Mr. Pope had searched the internet for "how long it took to get a search warrant."  Law enforcement also found photos of Mr. Pope with firearms on his cell phone.  On September 24, 2020, a grand jury returned a two-count Indictment against Mr. Pope, and, on that same date, the government's motion for an arrest warrant was granted.  Mr. Pope, however, was not able to be found and he was deemed a fugitive.  Twenty-three months later, on October 14, 2022, Mr. Pope was arrested.

### Line Sheets

During the hearing, the government introduced several exhibits called "line sheets," described as transcripts of intercepted and monitored Title III communications.  Gov. Exs. 4-14. The line sheets captured intercepted conversations that had occurred between September 16,

2019 and November 17, 2019. These conversations occurred over a two-month period of time leading up to the November 13, 2019 HDS Indictment and the November 19, 2019 arrest of HDS members. The government sought to introduce the line sheet information to establish that law enforcement knew that 1727 Wesley Street was a location used for drug distribution, that it was a location where HDS firearms were likely present, and that it was a location that Mr. Miller had regularly used to distribute drugs during his time on "rotation." A summary of the relevant intercepted conversations that had occurred prior to the November 19, 2019 arrest of Mr. Miller at 1727 Wesley Street, is as follows.

September 16, 2019

- During a call from Howell to Miller, Howell indicated he was going to call a ride to go to 1727 Wesley to pick up Miller. Gov. Ex. 9, at 1.

September 20, 2019

- Mr. Howell told Mr. Miller that he "grabbed a 4-5 for us too." Gov. Ex. 4, at 4. Sergeant Brennan testified that a "4-5" refers to a .45 caliber firearm. Mr. Howell then immediately told Mr. Miller, "Yeah, I bought another GUN so we got one around for, only for, only you and [Wesley Ellis Barnes] are allowed to use my shit." *Id.* Mr. Howell then said, "only you and [Barnes] bro …I already told [Barnes] and we might get this third one. If we get this third one, I'm just going to give you one. That way, me, you, and [Barnes] always got one." *Id.*

- In a conversation between Mr. Howell and Wesley Ellis Barnes, Barnes told Howell that he would "bring you the GG, [and] give FREDO the nickel." Gov. Ex. 5, at 1. Later in the conversation, Barnes repeated the statement, saying, "I'd rather give you the GG and let him [Miller] take the 4 nickel." *Id.* Sergeant Brennan testified that a "nickel" and "4 nickel" in this context refers to a .45 caliber firearm, a "GG" refers to a Glock firearm, and that "Fredo" was a known nickname for Mr. Miller.

September 21, 2019

- Wesley Ellis Barnes told Howell that he "just took FREDO his GG." Gov. Ex. 6, at 2.

September 26, 2019

- Howell asked Barnes, "who got what guns?" Gov. Ex. 6, at 3. Barnes responded, "four- nickle Ruger for $200" [apparently referring to the gun Barnes had, because later in the conversation Barnes states, "We gave Reese our 'GG.'" *Id.* at 4. Sergeant Brennan testified that "Reese" was another known nickname for Mr. Miller.

October 7, 2019

- Howell asked Miller "what the address is bro, I forgot the address." Gov. Ex. 7, at 2. Miller responded, ""1727 Wesley." *Id.*

- Wesley Ellis Barnes, a high level HDS member, asked Miller where he was? To which Miller responded, "on the brick road." Gov. Ex. 8, at 1. Sergeant Brennan testified that the Brick Road, Brick House, or Brick are references to 1727 Wesley Street. The government supported this testimony with a photo of 1727 Wesley Avenue that shows that the Wesley Street road is composed of bricks. Gov. Ex. 15.

- After Miller told Barnes he was at the "brick road" (1727 Wesley Avenue), Barnes told Miller he would be at that location "in a couple of minutes." Gov. Ex. 8, at 1. Barnes told Miller he was bringing him "the other ZIP," explaining, "you goin to need it ,[as] [t]hat many grams is going to be gone quick as hell." *Id.* Miller told Barnes that he "got that scale for you too," and Barnes responded, "I just bought a new one." *Id.*

- Mr. Miller asked Mr. Howell if he, Mr. Miller, left "his PIECE in there on the heater box." Mr. Howell responded, "Yea, yea, I got it." Gov. Ex. 4, at 1.

- Mr. Miller and Mr. Howell talked about a person who may or may not have lived next door to the McKeesport residence. Gov. Ex. 4, at 2. Relevant to this case, Mr. Miller told Mr. Howell, several times, how in response to the appearance of these unknown persons, he "started loading shit up," and that he "immediately ran upstairs and grabbed the DRAKO and loaded that bitch up and I came downstairs." *Id.* Mr. Miller also explained to Mr. Howell, the observations he made that "made him LOAD it up." *Id.* Sergeant Brennan testified that the above refences refer to loading a firearm and that DRAKO refers to a firearm.

October 9, 2019

- Miller informed Howell that Barnes had told an apparent customer, "You know when [Miller] is in Wilkinsburg, [Miller] on [rotation] late." Gov. Ex. 12. at 1. The 1727 Wesley Street residence is located in Wilkinsburg.

October 23, 2019

- Barnes told an HDS customer, Kristofer Carlino, that "FREDO will be on [rotation] at 10:30." Gov. Ex. 12, at 2. Barnes and Carlino then discussed how FREDO was always late. *Id.* Barnes confirmed to Carlino that FREDO "will be in 'the burg' tomorrow." *Id.* Sergeant Barnes testified that the "burg" refers to the 1727 Wesley Street residence, which is located in Wilkinsburg.

October 25, 2019

- During a conversation between Miller and Barnes, some of which concerns the distribution of drugs, another person "B" arrived at Miller's location and joined the conversation on speakerphone. Gov. Ex. 13, at 1. Sergeant Brenner testified the "B" refers to Brandon Campbell Taylor, at the time, a suspected member of HDS, who later was convicted based upon his involvement with the organization.

November 16, 2019

- Barnes told Miller he needed to turn his other phone on so that they didn't lose money. Gov. Ex. 14, at 1. Later, Barnes complained to Howell about Miller hanging around Wilkinsburg and lying that he was at his mother's place. *Id.* at 2. That same day, Miller and Barnes talked about a female, named Angel. *Id.* at 3.

- In the early evening of November 16th, Barnes and Miller talked about Miller's drug supply and what was needed. *Id.* at 4. Shortly thereafter Barnes told a person named "Corky," that he needed to get "Reese" a starter kit for his rotation week. *Id.* at 5.

November 17, 2019

- Miller told Barnes that someone had asked Miller where he was, and Miller said he told that person that he was "in the bricks." Gov. Ex. 10. at 2.

**II.      Motion to Suppress Physical Evidence and Statements**

Mr. Pope argues that law enforcement's protective sweep of 1727 Wesley Street, performed without consent and without the presence of exigent circumstances, was unconstitutional under the Fourth Amendment. He argues that law enforcement was not justified in conducting a protective sweep of the house, because Mr. Miller, a non-resident, was arrested outside of 1727 Wesley Street, and only after said sweep did law enforcement procure a search

warrant. As such, Mr. Pope argues that all evidence obtained from the residence on November 19, 2019 must be suppressed as fruit of the poisonous tree.

### A. Standing

Mr. Pope argues that he properly has standing to challenge the search of 1727 Wesley Street. On the day of his arrest, he told law enforcement that he was a resident of the house, on and off, due to his relationship with Angel Smith. Mr. Pope said he had a key to the residence, which he showed to the officers. Ms. Smith separately corroborated that Mr. Pope was a resident of 1727 Wesley Street, but she recently told Mr. Pope to get his belongings out of the residence. At the time of his arrest, Mr. Pope still possessed a key to the residence, which he apparently used to enter the side door while law enforcement was outside the residence. Regardless of the exact date and time when Ms. Smith told Mr. Pope to get his belongings out of the house, at the moment when he entered the residence to ostensibly retrieve his belongings on November 19, 2021, Mr. Pope had standing. Mr. Pope manifested a subjective expectation of privacy, based upon his living in the residence off and on, storing his belongings in the residence, possessing a key to the residence, and maintaining a relationship with the resident who gave him a key. *California v. Ciralo*, 476 U.S. 207, 211 (1986). The Court also concludes that Mr. Pope's subjective expectation of privacy is one that society is willing to objectively recognize as a reasonable expectation. *Id.* Therefore, he possessed sufficient standing as a resident of the home to challenge the search of the residence.

### B. Authorization for a Protective Sweep and Execution of a Search Warrant

Mr. Pope argues that the government is unable to demonstrate a justification for conducting the warrantless protective search of 1727 Wesley Street once Mr. Miller was arrested outside of the residence. He further argues that, if the protective sweep was illegal, the Affidavit

11

in support of the search warrant for the residence was not supported probable cause. The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizure, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. Amend. IV. The Fourth Amendment protects the public from unreasonable searches and seizures. A warrantless search of a residence is presumed unreasonable, unless an exception applies to the circumstances of the search. *Horton v. California*, 496 U.S. 128, 133 (1990). One such exception to the warrant requirement is "a protective sweep of a home based upon reasonable suspicion that an individual posing a danger to law enforcement may be in the area searched." *United States v. Folks*, 452 F. Supp. 3d 238, 250 (W.D. Pa. 2020) (citing *United States v. White*, 748 F.3d 507, 511 (3d Cir. 2014); *Maryland v. Buie*, 494 U.S. 325, 344 (1990)). A warrantless, protective sweep of a residence is permitted where the sweep is "based on reasonable and articulable suspicion that the areas being searched may 'harbor [ ] an individual' who poses a danger to those present at the scene of the arrest." *White*, 748 F.3d at 511 (quoting *Buie*, 494 U.S. at 334). A warrantless protective sweep of a residence is permissible, because "'[i]t would be imprudent to prohibit officers who are effecting an arrest or waiting until a warrant may be obtained from ensuring their safety and minimizing the risk of gunfire or other attack coming from inside the home if they have reason to believe that dangerous individuals are inside.'" *Folks*, F.Supp.3d at 252 (quoting *White*, 748 F.3d at 511).

It is the government's burden to establish, by a preponderance of the evidence, that a warrantless protective search is within one of the recognized exceptions to the warrant requirement. *See United States v. Herrold*, 962 F.2d 1131, 1137 (3d Cir. 1992). "Any evidence

obtained pursuant to a warrantless search that does not meet a recognized exception to the warrant requirement must be suppressed as 'fruit of the poisonous tree.'" *Folks*, 452 F.Supp.3d at 250 (citing *United States v. Brown*, 448 F.3d 239, 244 (3d Cir. 2006) (citing *Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963)).

The Court finds that law enforcement's protective sweep of the residence, after arresting Mr. Miller outside the residence, falls within the exception announced in *Buie*. Federal agents planned to execute the arrest warrant for Mr. Miller at his known residence in McKeesport. Through location tracking of Mr. Miller's cell phone, law enforcement located Mr. Miller's cell phone as being at 1727 Wesley Street. This address was well known to the investigating agents through the extensive Title III wiretaps that showed that Mr. Miller spent a significant portion of time at 1727 Wesley Street, also known as the "brick," "the "bricks", or the "brick road." *See* Gov. Exs. 7, 8, 9, 10, 12, & 15. The intercepted communications introduced at the hearing also demonstrate that the investigators were aware that Mr. Miller discussed his "rotation" drug distribution activities with Mr. Howell and Mr. Barnes, and that Mr. Miller conducted illegal drug distribution from that residence. *See* Gov. Exs. 12, 13-14. Further, on November 16 and 17, 2019, the Title III intercepts supported the conclusion that Mr. Miller was beginning his rotation and that, in addition to his presence at 1727 Wesley Street, drugs were likely to be present there as well. The agents were also aware that, in addition to the possession and distribution of drugs, members of HDS, and specifically Mr. Miller possessed firearms. *See* Gov. Exs. 4-6. The above information was also current, as the Line Sheets reflecting the relevant intercepted communications, all occurred between September 16, 2019 and November 17, 2019. This time frame is the final two months of the investigation into HDS leading up to the

November 13, 2019 Indictment against Mr. Miller and twelve others and the November 19, 2019 arrest at issue.

Overall, the Title III investigation into the HDS drug trafficking organization revealed that the conspiracy consisted of numerous individuals, including those thirteen named in the Indictment, plus other individuals named in separate indictments, and other yet unknown, potential HDS members or associates, who were engaged in the sophisticated and rigorous conspiracy to unlawfully possess and distribute controlled substances. As is typical with illegal drug distribution, the entire investigation, including the intercepted communications, revealed the presence and possession of firearms by and among members of the conspiracy. As noted, intercepted communications revealed several discussions among Barnes, Howell, and Miller concerning provision of a firearm to Mr. Miller to assist him in his HDS activities. On September 21, 2019, Barnes confirmed to Howell that he "just took FREDO his GG [Glock firearm]." Gov. Ex. 6, at 2.

Based upon the above information, the warrantless protective sweep of the residence, conducted by SWAT Operators, was proper. Mr. Miller was known to be an active member of a large drug conspiracy in which several members, including Mr. Miller, possessed firearms. He was also a known convicted felon, who was not permitted to possess a firearm. When he was on "rotation," Mr. Miller had a well-established presence at 1727 Wesley Street, as confirmed by the Title III intercepts. Law enforcement could not be certain whether or not any other member or members of HDS were present within 1727 Wesley Street, which would have posed a danger to law enforcement. At the time of Mr. Miller's arrest, the evidence supports that law enforcement reasonably believed that dangerous individuals could be inside the house. Such circumstances reasonably present the immediate likelihood of danger, such that the officers were

not required to "wait[] until a warrant may be obtained" to ensure their safety and minimize the risk of an attack. *White*, 748 F.3d at 511. Therefore, the Court concludes that law enforcement possessed a reasonable and articulable suspicion that a dangerous individual may be inside the home, which justified the protective sweep of the residence.

While conducting the protective sweep, officers observed, in plain view, four firearms. Wesley Street Aff. ¶ 13. In support of applying for a search warrant for 1727 Wesley Street, Special Agent Gaucher was also permitted to include the fact, that law enforcement observed firearms in the residence, to further support probable cause for the search. Accordingly, the Court finds that the search warrant for 1727 Wesley Street was supported by probable cause.

### III.     Motion to Suppress Phone Seizure and Search

Mr. Pope also argues that the search of his cell phone, performed pursuant to a warrant, was conducted in violation of the Fourth Amendment. The Fourth Amendment of the United States Constitution protects the public from unreasonable searches and seizures. When making a probable cause determination, a magistrate must ascertain "whether there is a 'fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Conley*, 4 F.3d 1200, 1205 (3d Cir.1993) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983) (internal citations omitted)). The test, as set forth in *Gates*, requires that the issuing magistrate "make a practical, common sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information," there is probable cause to support a warrant. *Id.* at 238. A magistrate's "determination of probable cause should be paid great deference by reviewing courts." *Id.* at 236.

"The duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for ... conclud[ing]' that probable cause existed." *Gates*, 462 U.S. at 236 (quoting *Jones v. United States,* 362 U.S. 257, 271 (1960)). "The supporting affidavit must be read in its entirety and in a commonsense and nontechnical manner." *Conley*, 4 F.3d at 1208. A warrant must be upheld "as long as there is a substantial basis for a fair probability that evidence will be found." *Id.* at 1205. However, reviewing courts must not "simply rubber stamp a magistrate's conclusions." *United States v. Tehfe*, 722 F.2d 1114, 1117 (3d Cir.1983).

Mr. Pope argues that the Affidavit in support of the search warrant for the cell phone fails to provide probable cause to believe that Mr. Pope was engaged in drug trafficking crimes. He contends that the Affidavit lacks probable cause, because it is based on speculative and conjectural assertions. He argues that the Affidavit lacks specific factual averments to support a belief that Mr. Pope had *any* connection to Mr. Miller, much less an illegal drug connection. He also argues that the Affidavit lacks facts to support a belief that evidence of drug offenses would be found on Mr. Miller's cell phone; and therefore, he concludes that the Affidavit fails to establish a nexus between Mr. Pope's cell phone and drug trafficking crimes. At the suppression hearing, defense counsel argued that there is no evidence to support the conclusion that law enforcement knew that Mr. Pope had a presence at 1727 Wesley Street, or that Mr. Pope had any connection to HDS at all. Sergeant Brennan admitted that the Title III investigators, to the best of his knowledge, were not aware of Mr. Pope before he was found inside the residence on November 19, 2019. Thus, defense counsel argues that the search warrant cannot establish probable cause to search Mr. Pope's cell phone.

The Cell Phone Affidavit provided all necessary facts to establish probable cause to support a warrant to search Mr. Pope's cell phone. Special Agent Goucher states, in Paragraph 6

of the Affidavit, that the cell phone is associated with Mr. Pope, "who, as explained below, is a close associate of a target subject [Mr. Miller] in a federal drug trafficking Title III investigation." Cell Phone Aff. at ¶ 6. The explanation of the association appears in the Affidavit under the heading, "Probable Cause." In that section, Agent Goucher explains that an arrest warrant for Mr. Miller was executed on November 19, 2019, at a residence where Mr. Miller was located through the use of cell phone location data. Aff. ¶ 12. The Affidavit further states that Title III intercepts confirmed that the residence had been a narcotics distribution location for Mr. Miller over the past several weeks. *Id.* Special Agent Gaucher also stated that "[d]uring execution of the [search] warrant, Mr. Miller stated there were firearms in the residence." *Id.* In Paragraph 13, Special Agent Gaucher stated:

> As your affiant prepared a search warrant affidavit for the home, agents secured the residence in preparation for the search and confirmed all individuals who were present departed the residence. While securing the residence, agents observed several firearms in plain view.

*Id.* at ¶ 13. Relative to Mr. Pope, Special Agent Goucher explains,

> prior to authorization of the search warrant, agents encountered POPE inside the residence. Subsequent to encountering POPE sneaking around the residence, agents noticed all of the firearms previously observed had been moved and hidden in different locations insider the residence. POPE stated that he had a key for the residence and discreetly entered to get his possessions because the female resident of the home had kicked him out.

*Id.*

Special Agent Goucher also informed the magistrate judge that the search of the residence revealed the presence of five firearms, 150 rounds of ammunition, multiple scales, over 400 grams of suspected fentanyl, and over $7,300 in United States currency. *Id.* at 14. The Affidavit states that, upon execution of the search warrant, the agents "noted the firearms had been concealed by POPE." *Id.* The suspected fentanyl was found in an old refrigerator and the Unites States currency was found in a bin in the garage. *Id.* Special Agent Gaucher then stated

his belief that, "POPE managed to sneak into the house after it was secured by agents for the purpose of hiding guns, drugs, and money from law enforcement due to his involvement in the conspiracy." *Id.* Mr. Pope's November 19, 2019 clandestine actions of entering the secured premises and secretly moving firearms, when viewed in conjunction with the information learned from the Title III investigation, including the fact that Mr. Pope resided at that residences, all reasonably lead Special Agent Gaucher to reasonably conclude that Mr. Pope was associated with Mr. Miller, HDS, and drug trafficking.

      The above information provides sufficient probable cause to support the belief that evidence of drug trafficking would be found on Mr. Pope's cell phone. The averments in the Affidavit clearly and reasonably establish a sufficient connection between Mr. Pope, Mr. Miller, HDS, and drug trafficking, to justify a search of his cellphone. Mr. Pope, knowing that law enforcement was outside the residence waiting for a search warrant, knowingly and surreptitiously entered the residence and hid firearms. The Affidavit further raises the reasonable conclusion that Mr. Pope also hid drugs and money when he went inside the residence. In light of the information concerning Mr. Miller, the HDS investigation, the presence of firearms, drugs, money, and drug trafficking in general, along with the averments recounting Mr. Pope's actions that morning, a magistrate judge, reviewing the Affidavit in a practical, common-sense manner, would be justified in concluding that there was probable cause to support a search warrant for Mr. Pope's cell phone. *Gates*, 462 U.S.at 238. Similarly, the Court concludes that the reviewing magistrate judge had a substantial basis to conclude that probable cause existed for authorizing the search of Mr. Pope's cell phone. *Id.* at 236. The search of the cell phone pursuant to the warrant was therefore proper.

### IV.    Conclusion

The Court's Opinion and Order, dated September 9, 2024, filed at ECF No. 66, is hereby VACATED. After having received evidence at the hearing on Mr. Pope's Motions, and after having carefully reviewed said evidence, the Defendant's Motions to Suppress, the parties' respective briefs ad arguments, and for the reasons explained above, Defendant's Motion to Suppress Physical Evidence and Statements (ECF No. 56) is DENIED, and Defendant's Motion to Suppress Phone Seizure and Search (ECF No. 61) is DENIED.

Dated: November 19, 2024

Marilyn J. Horan
United States District Court Judge